Julia C. Hiesiger, Respondent, *v.* Asher Hiesiger et al., as Copartners, Doing Business as Arrowley Manor Company, et al., Appellants.

First Department, March 9, 1971.

*Sheridan Albert* of counsel (*Pokorny, Schrenzel & Pokorny,* attorneys), for Asher Hiesiger, appellant.

*W. Bernard Richland* of counsel (*O'Dwyer & Bernstien,* attorneys), for Charles L. Keith and others, appellants.

*Michael Rosen, Joseph E. Brill* and *John Pollok* of counsel (*Brower, Brill & Gangel,* attorneys), for respondent.

Macken, J. Defendants appeal from an interlocutory judgment rescinding transfers by plaintiff to defendants of 25 parcels of rental real estate of which 19 had been held by her individually and 6 by corporations of which she was the sole stockholder, and directing the return of the properties and an accounting covering the period during which defendants held them.

In an opinion decision with sparse specific findings of fact the trial court held that while plaintiff was " completely under their domination " the individual defendants, Hiesiger and Keith, by their " representations and ominous forebodings " wrongfully induced the plaintiff to transfer the properties to them for an inadequate consideration.

In our opinion this conclusion is not supported by the evidence and the judgment should be reversed and the complaint dismissed.

Plaintiff's immediate family consisted of an unmarried daughter Cecelia, a married daughter living out of the State, and a son, the defendant Asher Hiesiger, a lawyer and successful owner and operator of extensive modern rental properties having an annual personal income of over $100,000. The older rent controlled properties here involved had been acquired and managed by plaintiff's husband until his death in 1957. Thereafter, they were managed by her brother until his death in January of 1966 and we find that during that period, despite her denial, plaintiff was conversant with the operation of the properties and actively participated in management decisions. Following her brother's death plaintiff together with her daughter Cecelia assumed the management duties until the fall of 1966. During that summer Cecelia underwent a serious operation and there was concern whether her health would permit her continued participation.

Meanwhile since 1964 plaintiff's properties had shown substantial and ever increasing deficits. In 1966 she sustained operating losses of well over $100,000 despite the fact that many of the rentals exceeded those permitted by rent control with the result that during the first 10 months she had been obliged to put $50,000 of her money into the operation.

Defendant Keith was a successful investor in and manager of distressed rent controlled properties and a partner of Asher in the ownership of some. Despite plaintiff's testimony that she first met him in 1965, it appears that plaintiff had hired Keith as a house painter in 1951, that over the years he had performed various services in connection with her and Asher's properties and was a close friend of the family. He was approaching retirement and was reluctant to assume more management business beyond that involved in handling his own properties. Nevertheless, in October plaintiff and Asher prevailed upon Keith to take over the management of the properties November 1 until a permanent manager might be found. During November and December plaintiff was required to advance an additional $47,000 to meet operating expenses. At the end of 1966 despite the fact that the properties had been inadequately maintained and required extensive repairs to comply with building regulations, and her contribution of $97,000, there remained unpaid current obligations of over $120,000.

In this posture plaintiff approached Keith in December, proposing that an arrangement be made whereby the properties might be transferred to Keith and Asher, relieving her of further responsibility. After conferences between plaintiff, Cecelia,

Asher, and Keith, an agreement was reached that the defendants would assume *de facto* ownership of the properties as of January 1, 1967, the details and formalizing of the transfer to be completed after consultation with accountants and attorneys as to the procedures to be followed. Although plaintiff denied that any such conversations took place, the operation of the properties after January 1 strongly evidences the existence of such an agreement. Payments to plaintiff of $1,300 a month which had been discontinued during November and December were resumed. She was no longer called upon to advance money and the practice of sending monthly statements to her accountants was discontinued. Of considerable significance is the unexplained failure of Cecelia, who was asserted to have been present at the conferences, to come forward in support of her mother's position.

Plaintiff testified she had wished to give her property to her children while she was alive and beginning in 1965 she had explored possibilities of gifting her properties to her children; forming a family partnership to include her children, her brother and herself; and arranging a net lease of the property to her children. All were rejected by her accountants and attorneys because of tax involvements, the principal stumbling block being that over the years plaintiff had mortgaged the properties excessively and from the proceeds withdrawn large sums of money of which $418,000 appeared on the books as owing the corporations.

Plaintiff was contemplating an extended trip to Israel in April, 1967. In March, at the suggestion of her accountants, a conference was had with an attorney-accountant tax expert, one Sherman, to consider the tax aspects of the proposed transfer. Plaintiff attended the conference and although at the trial she denied there was any discussion of a transfer of the properties and maintained that even when she executed the transfer documents was unaware that Keith was a party to the transaction, Sherman testified that the very purpose of the meeting was to discuss a transfer of the properties to Asher and Keith.

It was eventually agreed that plaintiff would transfer her properties in exchange for the following: she would be paid $50,000 cash for her equity in her individually owned properties; for the assignment of the corporate stock she was to be paid $234,000 payable $1,300 a month for 15 years and given a rent free apartment for life. In addition, all obligations past due at the end of 1966 and the expense of deferred maintenance and correction of building violations, the latter estimated without

contradiction to be in excess of $250,000,[1] would be paid by defendants with tax credit to plaintiff. She was also to be relieved of her obligation to repay $418,000 to the corporations and efforts made to so structure the transaction as to minimize her tax liability.

One Fish, an attorney of over 30 years' standing, was retained to prepare the necessary closing papers and, at plaintiff's request, a will and trust agreement. The trust agreement involved the proceeds of the sale of one of her properties not included in the transfer to defendants and which had been sold in February. Plaintiff and Cecelia were the beneficiaries of the trust and Asher and Keith were named executors and trustees in the will and agreement. Plaintiff testified she visited the attorney's office on but one occasion, April 6, the night before sailing for Israel, and there signed a number of papers including the will and trust agreement without reading them or knowing their contents and was unaware that Keith, although present at the time, was a party to the transfer. Fish testified and we find that she and her son conferred with him on two previous occasions, March 31 and April 4, and the transaction was thoroughly discussed and understood by her.

Plaintiff claimed the defendants repeatedly criticized her accountants, warned her that she was subject to penalties by reason of her tax situation, told her that she and Cecelia were subject to criminal prosecution in connection with the building violations, and that she signed the papers to save Cecelia and herself from going to jail. Her testimony was evasive, replete with incredible asserted lack of memory of material events, and in many instances self-contradictory and contradicted by her own witnesses. Her seeming clearest recollection, repeated at every opportunity, was that Keith and her son told her that she and Cecelia might go to jail unless she transferred the properties.

We find that plaintiff was fully aware of the financial and physical condition of her properties, the nature and implications of her tax situation and the possible penalties attendant upon the building violations. She initiated and participated in the various discussions leading up to the transfer of the properties and knew they were being transferred to Keith and her son. The trial court made no finding that the defendants made any false representations, and we find that her transfer of the properties was not induced by misrepresentation, duress, intimidation or undue influence by the defendants.

---

1. Defendant's operating statement from January 1, 1967 through June 1968, placed in evidence by plaintiff, reveals expense for " equipment, improvements, repair and maintenance " of $223,000 of which $178,000 was " structural ".

From the record we are convinced that the court's decision was largely motivated by its conclusion that plaintiff had an equity in the properties of "several million dollars" over mortgages and other liabilities, an impression apparently gained during the opening statements of counsel. This conclusion is not supported by the evidence. (*Matter of City of New York* [*A. & W. Realty Corp.*], 1 N Y 2d 428.)

The appraisal of rental property necessarily involves the discretionary application of one or more accepted methods of computation and we must recognize that appraisers retained in litigated matters, within the limits of professional integrity, tend to adopt those formulae which favor their employer's position. Plaintiff's appraiser's valuation was $4,200,000 which he conceded might be subject to error of up to 20%. In arriving at this figure he did not consider the existence of rents in excess of the controlled rents, building violations and deferred maintenance, that there was a single buyer for all of the properties, tax considerations, and that plaintiff was giving quitclaim deeds and would incur no expense in the transfer. There were mortgages of $2,050,000 unpaid bills and obligations of approximately $120,000 and deferred maintenance including structural building violations requiring in excess of $250,000 to correct. In addition, the plaintiff owed the corporations $418,000. The cash to be paid plaintiff and the value of her rent free apartment, when added to her foregoing liabilities, produce a figure closely approaching the lower limit of plaintiff's appraiser's valuation.

Nowhere in the evidence is there an intimation that plaintiff ever considered placing the property on the open market and upon being told by her accountant several days before the transfer that he thought she was not getting enough money and knew of a prospective buyer who might be willing to pay $500,000 more after seeing all of the records, plaintiff told him to "forget it". The evidence does not support a finding that the consideration was such as to constitute overreaching.

In the fall of 1967 plaintiff learned that since the transfer to them defendants had placed "substantial" additional mortgages on the properties from which she apparently concluded they were more valuable than she had believed. Ironic is plaintiff's allegation in her complaint that defendants "saddled said properties as aforesaid with mortgages aggregating $387,873.04, an overwhelming portion of which they converted to themselves". Rather, the evidence shows that a substantial part of the new mortgage money was used to discharge existing mortgages and the balance devoted to repairing the properties. August 1, 1968, some nine months after learning of the new

mortgages, plaintiff notified defendants of her election to rescind the transfers. In the meantime she had accepted her monthly payments of $1,300 and defendants had continued to improve the properties. While there may be merit in defendants' contention that she thereby ratified the transaction and waived her right, if any, to rescission, we prefer to rest our determination on the grounds heretofore stated. (*Kazaras* v. *Manufacturers Trust Co.,* 4 A D 2d 227, 239, affd. 4 N Y 2d 930.)

The judgment and order appealed from should be reversed on the law and facts, without costs and without disbursements, and the complaint dismissed. Findings of fact inconsistent with this opinion should be reversed and new findings made in accordance therewith.

McGIVERN, J. P. (dissenting). I disagree — and I would affirm the conclusion of the Trial Justice that the properties be returned to the plaintiff and that there be an accounting, the defendants receiving full credit and compensation, for their expenditures and efforts.

In dismissing the complaint, after overthrowing a determination in favor of an aged mother against her son-attorney-confidante, the majority are now at odds with two of the most rudimentary principles known to the law:

First, in a contest between the weak and the strong, not on terms of equality, the aged and the young, the former not represented by an attorney, the latter, in this case, not only an attorney himself but in a position of confidence — the burden is on the latter to demonstrate the *bona fides* of his conduct. (*Meinhard* v. *Salmon,* 249 N. Y. 458, 464; *Cowee* v. *Cornell,* 75 N. Y. 91; *Green* v. *Roworth,* 113 N. Y. 462; *Barnard* v. *Gantz,* 140 N. Y. 249; *Matter of Peterson,* 257 App. Div. 449; *Feiber* v. *Copeland,* 232 App. Div. 504; and *Mott* v. *Mott,* 49 N. J. Eq. 192.) The Trial Judge has found the burden was not met, in my view, correctly; and his ultimate determination was fully supported by the record.

Secondly, the determination of a Trial Judge on issues of credibility is rarely disturbed. His " decision should be given the greatest weight ". (*Amend* v. *Hurley,* 293 N. Y. 587, 594; see, also, *Kelly* v. *Watson Elevator Co.,* 309 N. Y. 49, 51; *Barnet* v. *Cannizzaro,* 3 A D 2d 745.) And the late Mr. Justice IRVING L. LEVEY was not easily fooled, if ever, on real property.

Reverting to my first point, we have here a widow bereft, bowed by the recent death of two brothers, and the near fatal illness of her daughter, who had previously assisted her in the management of her properties. On the other side of the table, we have her son, himself represented by an attorney, Mr. Fish.

Her son is there in double trust: first as her son, who, against any overreaching, should bar the door, not overreach himself. Then, as an attorney himself, in turn represented by an attorney, he should be more than ordinarily alive to double-dealing and breach of trust. And the last word on this subject was spoken by Mr. Fish. (The same Mr. Fish who the defendants say represented the plaintiff): " I came into this case through Mr. Hiesiger. He paid me, and, therefore, I represented him ".

Further, that there was a palpable fear of criminal prosecution harbored by the plaintiff mother, I have little doubt. The Trial Judge found that Asher Hiesiger " kept impressing on her the probable civil and criminal penalties which could be imposed on her and her daughter because of alleged violations ". I believe both the exhibits and the testimony sustain this conclusion. (See Williston, Contracts, § 1613; *Adams* v. *Irving Nat. Bank,* 116 N. Y. 606.) Also, like the Trial Judge, I find no writing relating to the duties allegedly assumed by the defendants, and no writing to protect the mother, vis-à-vis her $1,300 a month (life expectancy: seven years). This $1,300 simply represented the amount she had been previously drawing for her personal expenses from the income derived from her properties. The gist of the deal seems to be that she transferred to the other side 20 buildings, received $50,000, and then handed it back. The other side being her son-attorney, his lawyer, Mr. Keith, her son's partner, who ended up with half the property, and Mr. Keith's brother and notary. Her accountant testified he did not know what was going on. I can believe it. Concededly, the properties were not all bad. Properly represented, she may well have rid herself of the troublesome ones. But, quoting Mr. Fish again (who the defendants say represented her): " I had never visited the properties. I did not know what they looked like ". And it must be noted that Mr. Fish — whose testimony is now sought to be impeached — was called as a witness on behalf of defendants.

Nor do I think the final signing of some of the documents on board ship, with the gangplank about to go up, a proper setting for a dispassionate decision on vast property holdings, resulting in a divestiture almost as complete as King Lear's. For be it noted, as a result of the transaction, her two daughters have nothing — and according to the Trial Judge, her mother is now on relief.

Nor do I fault the plaintiff for waiting until August of 1968 to sue. The doctrine of ratification does not apply until knowledge of all the facts sets in. (37 Am. Jur. 2d, Fraud and Deceit, §§ 417, 418.) And her continuing trust in her son-attorney dulls

the application of the doctrine. (*Feiber* v. *Copeland*, 232 App. Div. 504, *supra*; *Cowee* v. *Cornell*, 75 N. Y. 91, *supra*.) She had no cause for continuing inquiry.

Finally, as to the majority's conclusion that the court's decision was "largely motivated" by "an impression apparently gained during the opening statements of counsel". That may very well have been so. I do not view it amiss:

"THE COURT: Was she represented by counsel?
"MR. ROSEN: No, she was not.
"THE COURT: Was the defendant represented by counsel?
"MR. ROSEN: The defendant is a lawyer and her son— yes.
"THE COURT: This is a mother-son situation?
"MR. ROSEN: It is, your Honor. Mr. Asher Hiesiger is the plaintiff's son".

The very scenario called for an immediate application of fundamental principles. And, it might appear, at the opening, Mr. Justice LEVEY seized the nub of the case. But he was right.

I would affirm.

MARKEWICH, NUNEZ and KUPFERMAN, JJ., concur with MACKEN, J.; McGIVERN, J. P., dissents in an opinion.

Order and interlocutory judgment (one paper), Supreme Court, New York County entered on June 29, 1970, reversed, on the law and facts, without costs and without disbursements, plaintiff's motion denied and the complaint dismissed.